## WALSH v REPUBLIC RUBBER Co

Ohio Appeals, 7th Dist, Mahoning Co

No 2231. Decided Oct 20, 1936

W. L. Countryman, Youngstown, and Sidney Rigelhaupt, Youngstown, for plaintiff.

Harrington, Huxley & Smith, Youngstown, for defendant.

**OPINION**

By ROBERTS, J.

This cause is in this court on appeal from the Court of Common Pleas, where it was tried upon issues presented by the second amended petition of the plaintiff and the answer thereto of the defendant. It was submitted to the court and resulted in a judgment for the plaintiff in the sum of $2100.00 and as part of the decree the temporary injunction theretofore granted was made perpetual against the defendant. Appeal was perfected in this court and the issues were submitted to the Honorable Charles M. Wilkins as referee, to make findings of law and fact upon the evidence taken in the Court of Common Pleas and such evidence as might be further heard by the referee. Thereafter the referee made a report in which he held that the plaintiff, by reason of the alleged trespass, was only entitled to nominal damages, and further indicated that under certain conditions "that injunction is a proper remedy to restrain such trespass." Counsel for the plaintiff filed exceptions to the report of the referee, consisting of eight propositions. Counsel for the defendant filed exceptions to the report of the referee comprising twenty-six propositions. These exceptions of the respective parties are so voluminous in their nature and so generally cover the issues in the case, and the evidence relating thereto, as to suggest the desirability or necessity of the consideration of the issues presented by the pleadings and to some extent the evidence relating thereto.

The plaintiff has a leasehold interest in a tract of land consisting of about 126 acres, located in the northeasterly part of the City of Youngstown, conveyed to him by the heirs of Homer Baldwin in 1932. The plant of the defendant is also located in the northeastern part of the city of Youngstown, on Albert Street, and it is extensively engaged in the manufacture of rubber products, employing several hundred men, and the nature of its business requires the use of a large amount of water. Kimmell

Brook empties into Crab Creek near the plant of the defendant company, and extends northeasterly for several miles. There is a descent of about one hundred feet for this distance into Crab Creek. It drains a considerable extent of territory and in times of freshet and heavy rain fall carries a considerable volume of water, with a very rapid current. The water of this brook was originally impounded by the defendant into a pond created by it near the factory. This water was found to be not suitable for the intended use, by reason of the fact that its temperature was too warm, the proper operation of the factory requiring use of water of a low degree of temperature of about fifty degrees. Considerable sediment also was brought down by the current of the water into this reservoir, rendering the water for the desired use undesirable. The operation of this plant requires the use of about five hundred gallons per minute. However, this use is not wholly continuous throughout the twenty-four hours of the day. There is evidence in the case indicating the use for about twenty-two hours per day and twenty-five days per month. Located on the northwesterly side of this stream were two old abandoned coal mines and the first about a mile and a half from the plant is known as the Cork and Bottle mine. About half a mile further up stream, and at an increased elevation of about forty feet, was located a mine known as the Thorn Hill mine. These mines were extensively operated by the late Chauncey Andrews from about 1856 for a period of some eight years. The mining was quite extensive, there being some two hundred men employed in the work. The underlying coal was of a superior quality, known as block coal number one. It was discovered by the defendant that there was a large quantity of water impounded in these old workings of a fine quality and of a temperature of about fifty degrees, making the water in these mines suitable and very desirable for the operation of the defendant's plant.

The land heretofore mentioned as having been leased by the plaintiff was located southerly from these mines, but not abutting upon Kimmell Brook, the northerly line of this tract being a considerable distance from the creek. Mr. Andrews also operated a mine on this tract and took out to a considerable extent the underlying coal. After Mr. Andrews ceased to operate the mines known as the Cork and Bottle and the Thorn Hill mines and the shaft located on the Baldwin farm, no effort to ex-

tract coal from these mines was made for over sixty years until the effort made by the plaintiff in the year 1932 or 1933. The evidence indicates a vast amount of water was impounded in the workings of these mines, the precise source of which water has not been determined, evidently coming from springs and under water percolation in and about the excavations. In the year 1911 the defendant commenced operations with a view to securing this underground water for the operation of its plant. For many years previous to 1911 a stream of water of considerable size had continuously flowed from the outlet or shaft of the Cork and Bottle mine into Kimmel Brook. The scheme adopted by the defendant to make this water available for its purpose was substantially this, a dam was constructed across Kimmel Brook at the location of the mouth of the Cork and Bottle mine, which was some twenty-five feet from the brook. This dam extended thirty feet across the brook, was constructed of concrete five feet high and three feet wide. Later the dam was extended, or a wing, so-called, constructed from the westerly end of the dam northerly along the channel of the stream. Water was conveyed from the shaft to the mine (into the dam) by syphoning it through a large pipe, which could draw water from the mine to a depth of about twenty-two feet. A ten inch pipe was laid through the dam and extending down in the general direction of Kimmell Brook to the plant of the defendant. A large pump was inserted in the shaft of the Thorn Hill mine for a considerable distance, by the operation of which a large amount of awter, consisting of several hundred gallons per minute, could be and was for a considerable portion of the time pumped out of this mine into Kimmel Brook, in which it flowed down to the dam at the Cork and Bottle mine, and from the dam flowed through the ten inch pipe to the defendant's plant. A connection was made on the westerly side of the dam, and some little distance underground, into the Cork and Bottle shaft, by which the water of the dam when it reached this elevation flowed into the shaft. Water was thus obtained from both the Cork and Bottle and Thorn Hill mines. The dam could be and was replenished by the pumping of water from the Thorn Hill mine into Kimmel Brook and by syphoning from the Cork and Bottle mine. It was necessary to take water from both of these mines only a part of the time. About one-third of the water which flowed down the pipe to the plant was preserved

for re-use by pumping it back up the pipe into the Cork and Bottle mine, where it again became cooled to the temperature of the water in the mine and became appropriate for re-use.

The plaintiff, as his first operation on his leased land, made some twenty-seven drillings for the purpose of locating coal and perhaps determining the extent of water underlying. He proceeded first, in attempting to extract coal, to clean out the old slope hereinbefore mentioned, upon his land, which with the lapse of many years had become filled with debris, and open this slope down to the coal, and intended then to proceed to make openings into the coal for the purpose of extracting it. Water came in so extensively that he was unable to prosecute this work and abandoned this slope. He then selected one of his drillings where the presence of coal had been indicated, and sunk a shaft to the depth of about sixty feet and extended workings into the coal therefrom, extracting coal until he had taken out about 6,000 tons, when the water suddenly, as he claims, came into these workings and his shaft in such large volume and with such rapidity that his workmen fled from the mine, leaving their cars and tools therein. Water has since stood in the shaft for a considerable depth. It is the contention of the plaintiff that he expended a large amount of money in attempting to take coal from this slope and shaft, which purpose has been wholly defeated by the continued presence of large quantities of water therein. There is no dispute but that the workings of the Cork and Bottle mine and the Thorn Hill mine come together and that people in the operation of the mines passed from one mine to the other. The same condition existed between the Thorn Hill mine and the slope of the plaintiff, tunnels having been created in their operations connecting these mines.

It is claimed by the plaintiff that this accumulation of water in his mines and preventing their operation was caused by the diversion of the water of Kimmel Brook at the dam adjacent to the Cork and Bottle mine, whereby it became mingled with the water which was turned into this brook at the Thorn Hill mine, and it was shunted into it at the Cork and Bottle mine. It is not contended that any surface waters from Kimmel Brook ever overflowed directly into the caverns resulting from the taking out of coal from these mines, but the plaintiff does claim that such water as constitutes the flow of Kimmel Brook,

irrespective of the water coming into the mines, is taken into the Cork and Bottle mine, and that by reason of the underground connection of these mines it flows to and contributes to the volume of water which compelled the abandoning of these mines. Since the installation of this construction of the defendant, all water ceased to flow out of the mouth of the slope of the Cork and Bottle mine, except as taken out by the syphoning of the water into the plant of defendant. It is very evident that a vast amount of water is continuously impounded in the workings of these old mines. A pump working at the capacity of several hundred gallons per minute for weeks succeeded in lowering the water in the Thorn Hill mine to a limited extent. Thereafter the operation of the pump did not lower the water in the mine, so that it remained within reach of and subject to the pump which extracted it therefrom.

Before commencing its operations the defendant purchased tracts of land of between two and three acres in extent at the Cork and Bottle and Thorn Hill mines. This land and the land of the plaintiff are not contiguous, but are separated by intervening lands of considerable width. The plaintiff had many years of quite similar experience and with the location of these old mines. While not subject to direct or positive proof, the evidence (and environments of the old and the condition attaching thereto) indicate that the plaintiff extended his new workings from the new shaft in the direction of the old workings on these premises (from the Thorn Hill mine), desiring to make a connection therewith and thus secure two outlets for his mine, which is a desirable condition for ventilation. In prosecuting and extending his work from the new shaft he did not employ what are said to be the usual expedient methods in such situation, to bore a small hole some ten or twelve feet in advance of the excavation of coal, whereby the approach of a volume of water might be discovered and further progress in that direction cease.

The evidence further discloses that the condition of this block coal, as found in this locality, is unusual; that the greatest thickness is found at the lowest level, that it has frequent "rolls" and is not of a smooth or regular surface, is somewhat crumpled up and thins out to a feather edge. so-called, especially when reaching the higher lands adjacent to the plaintiff's property. In any event, the operations of the plaintiff reached such a point and loca-

tion as to permit the entrance of the water complained of into the new shaft. It is reasonable to presume that the excavation of coal was extended to where the opening came in contact with the old Andrews workings, resulting in the flooding of the shaft. Testimony of engineers is that water stands in the shaft at substantially or a little higher elevation than the water in the old mines.

We now reach the concrete proposition in this case, as to whether water flowing in Kimmel Brook through the Cork and Bottle mine reaches the property of the plaintiff to his injury or damage. It is said that in times of high water, floods and freshettes a considerable flow of water goes into Kimmel Brook. Owing to the rapidity of the current, this condition soon terminates and under ordinary circumstances there is but little water flowing into the brook. There is an opening in the center of the dam at the Cork and Bottle mine near the bottom of the dam, by which the water can be drawn from the dam into the brook. This can be opened or closed as existing conditions may make desirable. The waters flowing into Kimmel Brook, by reason of their warm temperature and contents, accumulated in the flow of the water along the brook, are not desirable for use in the plant of the defendant, and effort is made to limit their use at times to permit their passage through the dam down the brook, bearing in mind that no complaint is made of the waters which flow down the brook. It is evident, however, that an exceedingly small amount of water from the brook, when commingled with the waters of Thorn Hill mine flowing down the brook, and to the extent that such waters are permitted to flow into Cork and Bottle mine for storage does gain access to the Cork and Bottle mine, and if the waters of Cork and Bottle mine are a part of and contribute to this vast subterranean cavern caused by the extraction of coal, and would thereby become an exceedingly small part of this large reservoir of water. In this connection it should be borne in mind, however, that as compared with this water of Kimmel Brook, which to a limited extent may get into this subterranean water, the defendant by the operation of its scheme for securing water for its plant, is pumping water from the mines, substantially all of which comes from the mines to the exclusion of Kimmel Brook, to the extent of from three to five hundred gallons per minute. One of the engineers in his testimony suggested the use of water at the plant to the

amount of one hundred and ninety-eight million and some odd gallons per year. This, however, should be lessened by the amount of water which when the down flow in the pipe is shut off is pumped back up the line and stored in the mine for re-use. A reasonable conclusion, therefore, is if the volume of water affecting the plaintiff's operations is aggravated or increased to a necessarily very small amount by the brook water, the operation of the defendant's plant nevertheless must be very beneficial to the plaintiff by the vast amount of water taken by the defendant from this subterranean source.

Another proposition was urged by counsel for the defendant, which was that the plaintiff was not entitled to maintain this action by reason of the fact that the conditions which he complained existed long before he acquired any interest in the property. Our examination of authorities upon this subject has led us to the conclusion that this claim is not well founded, by reason of the continued existence of the nuisance, so-called. The authorities seem to be quite uniform that the latter may maintain an action for damages occurring to him notwithstanding it was existing previous to his acquiring interest in the land.

This court has given careful consideration to the evidence taken in the Court of Common Pleas and before the referee, examined authorities cited and many others, and has reached the conclusion that the plaintiff has sustained no damages by reason of the conditions of which he complains, but has, as a matter of fact, been benefitted, and therefore is not entitled to any judgment for damages or injunction restraining the defendant in the manner of its accumulation of the water for the use at its plant.

CARTER and NICHOLS, JJ, concur.